# ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2007 APR 23 A 10: 53

CLERK _____
_____ GA.

GIA HEGRE,       *
      *
      Plaintiff,       *
      *
      v.       *       CV 105-031
      *
ALBERTO-CULVER USA, INC.,       *
d/b/a BEAUTY SYSTEMS GROUP, INC.,       *
d/b/a SALLY BEAUTY COMPANY,       *
d/b/a MACON BEAUTY SYSTEMS,       *
      *
      Defendants.       *

## O R D E R

Plaintiff brought the captioned case pursuant to the Family and Medical Leave Act ("FMLA"), 28 U.S.C. § 2601, *et seq.* The matter is before the Court on Defendants' motion for summary judgment. (Doc. no. 36.) For the reasons discussed below, the motion is **GRANTED**.

## I. BACKGROUND

### A. Plaintiff's Complaint

Plaintiff, a former employee of Defendant Beauty Systems Group, Inc. ("BSG"), worked as the manager of a cosmetics store in Augusta, Georgia, until she was fired on March 4, 2003. In her complaint, Plaintiff contends that, in September 2002, she asked her supervisor, District Manager Steve Norris, for "about a month off to adjust to new medication that she would take at the beginning of the leave." (Compl. ¶ 22.) Mr. Norris allegedly asked her to wait until arrangements

could be made to ensure that the Augusta store's operations were not interrupted. (Id. ¶¶ 23-24.) These arrangements included hiring new staff for the store. Nevertheless, Defendant BSG allegedly failed to take proper action to hire new employees for the Augusta store, leaving Plaintiff overworked and unable to take her desired leave. (Id. ¶¶ 25-28.)

On February 24, 2003, Plaintiff allegedly filled out a "leave request form" requesting "more than five days" of "sick leave" and gave it to Mr. Norris. (Id. ¶¶ 29-30.) This form was never processed. (Id. ¶¶ 31-32.) On Friday, February 28, 2003, Plaintiff gave Mr. Norris a note stating that she would not be working March 1-2, 2003. Later that day, Mr. Norris and Plaintiff got into an argument regarding whether it was Plaintiff's responsibility to arrange for BSG employees from other stores to operate the Augusta store in Plaintiff's absence; following this disagreement, Mr. Norris suspended Plaintiff for the "pretextual" reason that she had allegedly called him a vulgar name. (Id. ¶¶ 26-40.)

Plaintiff was terminated a few days later. She maintains that she was actually terminated "for attempting to exercise rights protected under the FMLA or in retaliation for attempting to exercise rights under the FMLA." (Id. ¶ 42.) This is her sole claim in the captioned case.

**B.  The Pertinent Evidence**

Plaintiff, who suffers from bipolar disorder and

2

hypertension, was under the care of three different healthcare providers between 2001 and her termination in March 2003: (1) Dr. Robert Edward Shervette, III, a psychiatrist, (2) Dr. Ruth Ann Nelson-Abbott, a clinical psychologist, and (3) Dr. Kellie Vaughn Lane, a cardiologist. Although Plaintiff's doctors apparently considered changing some of her prescriptions, contrary to the allegations of Plaintiff's complaint, none of Plaintiff's healthcare providers ever recommended that Plaintiff take a leave of absence in order to adjust to new medications. (See Nelson-Abbott Dep. at 9-12; Shervette Dep. at 14-15; Lane Dep. at 18, 20-21.) Nor is there any evidence in the record that a change in Plaintiff's medications has ever caused her to miss work.

That said, in August 2001, Plaintiff was hospitalized following a manic episode. (Pl.'s Dep. at 20; Pl.'s Dep. Ex. 1; Norris Dep. at 21-22.) Plaintiff was granted a medical leave of absence and returned to her work as manager of the Augusta store in October 2001 without any restrictions. (Bartrug Decl. Ex. 1; Pl.'s Dep. at 50, 52, 75.) Plaintiff also had a cardiac catherization in May 2002, but there is no indication that Plaintiff had to miss work as a result of the procedure. (See Lane Dep. at 8.)

Also of note, on February 17, 2003, Mr. Norris issued Plaintiff a written "corrective action" for her alleged failure to maintain a professional environment and to manage her employees at the Augusta store properly. (Norris Dep. at

3

50-51; Norris Dep. Ex. 4.) After receiving this written reprimand, Plaintiff developed a nosebleed and left the store to see Dr. Lane. Dr. Lane recommended that Plaintiff take two days off in order to ensure that her blood pressure was properly regulated. (Lane Dep. at 14-15.) Noting Plaintiff's apparent stress at work, Dr. Lane also asked Plaintiff to consider looking for a different job. (Id. at 18.)

Although Plaintiff contends that she was required to open and close the store on February 18-19, 2003, she acknowledges that she was otherwise allowed to take those days off in accordance with Dr. Lane's instructions.[1] (See Pl.'s Dep. at 99.) On February 24, 2003, Plaintiff allegedly filled out a request for an indefinite period of medical leave; according to Plaintiff, Mr. Norris failed to have it processed. (See Pl.'s Dep. Ex. 3.)

Later, on February 27, 2003, during an appointment with Dr. Nelson-Abbott, Dr. Nelson-Abbott advised Plaintiff to stop working more than five days per week. (Nelson-Abbott Dep. at 10-11.) Plaintiff told Dr. Nelson-Abbott that she could handle her work schedule and rejected Dr. Nelson-Abbott's offer to write a letter to her employer about her need for a reduced work schedule. (Id. at 7-8, 10-11.)

At approximately 1:00 p.m. the following day, Friday,

---

[1]Although Mr. Norris brought in employees from other BSG stores to run the Augusta store in Plaintiff's absence, Plaintiff allegedly had to stop by the store to open and close it because no one else had keys to the store. (Pl.'s Dep. at 99.)

4

February 28, 2003, Plaintiff gave Mr. Norris a note complaining that she was "overextended" and would not be working the following two days, March 1-2, 2003. Plaintiff did not further explain her need to take the days off or provide any further documentation regarding her request. (Norris Dep. at 71-72.) Later that day, Plaintiff and Mr. Norris got into an argument regarding whether it was Plaintiff's responsibility to ensure that the Augusta store was "covered" during her absence. (See 2004 Norris Dep. at 69; 2004 Pl.'s Dep. at 245.) According to Mr. Norris, during this conversation Plaintiff called him an "asshole." (2004 Norris Dep. at 72, 75.)

While in Plaintiff's presence, Mr. Norris called Mr. Doug Olson of BSG's human resources department to inform him of what had just happened. (2004 Pl.'s Dep. at 246.) After informing Mr. Olson of the alleged profanity, Mr. Norris suspended Plaintiff without pay; on March 4, 2003, she was fired. (Id. at 28, 247; see also 2004 Norris Dep. at 72, 79.) This decision to terminate Plaintiff was made jointly by Mr. Olson and Mr. Joseph Krimmer, BSG's Regional Manager. (See 2004 Krimmer Dep. at 52, 57-58.) Although Plaintiff denies using profanity, she took no action to challenge her suspension or her termination. (Bartrug Decl. ¶ 20.)

## II.   REQUIREMENTS FOR SUMMARY JUDGMENT

The Court should grant summary judgment only if "there is

5

no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, . . . no reasonable jury could find for the non-moving party." Four Parcels, 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry the initial burden in one of two ways--by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991)

6

(explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If--and only if--the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. Again, how to carry this burden depends on who bears the burden of proof at trial. If the *movant* has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. Anderson, 477 U.S. at 249. If the *non-movant* bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact,

7

the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Fed. R. Civ. P. 56.

The Clerk has given the non-moving party notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. no. 44.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (*per curiam*), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration.


### III.  DISCUSSION

Defendants offer four reasons why they are entitled to summary judgment: (1) Defendants Alberto-Culver USA, Inc. ("AC") and Sally Beauty Company ("SBC") cannot be considered her "employer" under the FMLA; (2) Plaintiff was not an "eligible employer" under the FMLA; (3) Plaintiff did not have a "serious health condition" under the FMLA requiring an

extended leave of absence as alleged in her complaint; and (4) Plaintiff was fired because of her use of profanity towards Mr. Norris, rather than in retaliation for her request for FMLA leave. As explained more fully below, the Court agrees with each of Defendants' arguments.

**A.   Plaintiff was not an "eligible employee."**

First, it is clear that, because only Defendant BSG may be considered Plaintiff's employer for FMLA purposes, Plaintiff was not an "eligible employee" under the Act. In order for the FMLA "to apply, the employer(s) at issue must have at least 50 employees within a 75 mile radius of the worksite." Morrison v. Magic Carpet Aviation, 383 F.3d 1253, 1254 (11th Cir. 2004) (citing 29 U.S.C. § 2611(2)(B)(ii)). Plaintiff worked at BSG's cosmetics store in Augusta, Georgia. It is undisputed that the Augusta store has never employed 50 or more employees. (Tanttari Decl. ¶¶ 5-6.) It is also undisputed that BSG's Columbia, South Carolina store is the only other BSG store within a 75-mile radius of the Augusta store. (Id. ¶ 4.) Together, these stores have never employed 50 or more employees; in fact, during the two years preceding Plaintiff's termination, the two stores only employed a total of 14 employees. (Id.)

Nevertheless, Plaintiff argues that the FMLA's "numbers test" is satisfied because Defendants are an "integrated enterprise," and when their employees are aggregated, there are more than 50 employees within a 75-mile radius of the

9

Augusta store. (Pl.'s Resp. to Defs.' Mot. for Summ. J. at 11.) Although Plaintiff has not furnished any proof that this is in fact the case, the Court assumes *arguendo* for the purposes of the instant motion that, if Defendants may be considered an "integrated enterprise," the FMLA's so-called "numbers test" will be satisfied. Plaintiff also argues that BSG has "admitt[ed] FMLA coverage." (<u>Id.</u> at 8.) The Court will address both arguments in turn.

Plaintiff contends that Defendants BSG, AC, and SBC, which are separate corporate entities, should be viewed as an integrated enterprise, together with their parent corporation, Alberto-Culver Company.[2] In support of her argument that these entities are an integrated enterprise, Plaintiff notes: (1) Michael Renzulli is the President of both BSG and SBC; (2) Jim Biggerstaff is the Vice President of Human Resources for both BSG and SBC; (3) SBC and BSG use the same FMLA paperwork; (4) SBC and BSG and the other named entities manufacture and sell cosmetics; and (5) SBC and BSG are subsidiaries of Alberto-Culver Company. Plaintiff also notes that Mr. Norris once asked Mr. Biggerstaff for advice regarding how to handle personnel issues at the Augusta store.

In support of their motion for summary judgment, Defendants note that BSG is a subsidiary of Victory Beauty

---

[2]Notably, Plaintiff has neither named Alberto-Culver Company as a party to the instant litigation nor served it with a copy of her complaint.

Systems, Inc. ("Victory"). (Roos Decl. ¶ 6.) Victory and SBC are subsidiaries of Sally Holdings, Inc. ("Sally"). (Id. ¶ 5.) Sally and Defendant AC in turn are subsidiaries of Alberto-Culver Company, a publicly-traded corporation. (Id. ¶ 4.) None of these corporations share day-to-day operations or accounting records. (Id. ¶¶ 7-10.) AC and Alberto-Culver Company are based in Illinois, while BSG and SBC are based in Ohio and Texas, respectively. (Id. ¶¶ 6-8.) Of particular import, BSG controls setting its own employees' pay, formulating job expectations, evaluating its employees' performance, and making employment decisions such as hiring, firing, demotion, and employee discipline. (Id. ¶ 11.) That said, Defendants acknowledge: (1) SBC and BSG share certain services, including the administration of leave policies (Tanttari Dep. at 5, 10); and (2) employees of Alberto-Culver Company's subsidiaries are allowed to participate in the parent company's profit-sharing plan (Roos Decl. ¶ 10).

To begin, in arguing that Defendants are an integrated enterprise, Plaintiff correctly concedes that, apart from such a theory, only BSG may be considered her employer. When determining whether an entity is a plaintiff's "employer" under the FMLA, the Court normally considers: (1) whether or not the employment took place on the premises of the alleged employer; (2) how much control the alleged employer exerted on the employees; and (3) whether or not the alleged employer had the power to fire, hire, or modify the employment condition of

11

the employees.  <u>Morrison</u>, 383 F.3d at 1255.  Here, the evidence demonstrates that Plaintiff worked on the premises of BSG's Augusta store, and there is no indication that any entity other than BSG had the ability to exert control over BSG's employees or to make employment decisions regarding them.

Turning to whether Defendants are an integrated enterprise, the Court considers whether "they have (i) Common management; (ii) Interrelation between operations; (iii) Centralized control of labor relations; and (iv) [A] [d]egree of common ownership/financial control."[3]  <u>Morrison</u>, 383 F.3d at 1257 (quoting 29 C.F.R. § 825.104(c)(2)).  To begin, there is no indication of interrelated operations.  In assessing whether corporate entities have interrelated operations, courts consider whether the businesses have "combined accounting records, bank accounts, lines of credit, payroll preparation, switchboard, telephone numbers, or offices."  <u>See</u> <u>Clark v. St. Joseph's/Candler Health Sys., Inc.</u>, CV 405-119, 2006 WL 2228929, at *5 (S.D. Ga. Aug. 3, 2006) (Moore, C.J.) (citing <u>Fike v. Gold Kist, Inc.</u>, 514 F. Supp. 722, 726 (N.D. Ala.), <u>aff'd</u>, 664 F.2d 295 (11th Cir. 1981)).  In the instant case, Defendants have combined none of these functions.

Next, although the evidence suggests some common

---

[3]The Court is aware that FMLA claims may be brought against multiple entities under a "joint employer" theory, <u>Morrison</u>, 383 F.3d at 1257-58; however, Plaintiff has explicitly abandoned any such argument (<u>see</u> Pl.'s Resp. to Defs.' Mot. for Summ J. at 8).

management, ownership, and control, there is no evidence that BSG does not make its own, independent employment and personnel decisions. "[C]ourts have recognized that the mere existence of common management and ownership are not sufficient to justify treating a parent corporation and its subsidiary as a single employer." Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 778 (5th Cir. 1997); see also Morrison, 383 F.3d at 1257 (holding that common ownership is insufficient to show that entities are a single employer under the FMLA).

In this regard, although Messrs. Renzulli and Biggerstaff are officers of both SBC and BSG, thus linking the companies at the "very top," to use Plaintiff's words, "the mere fact that the subsidiary's chain-of-command ultimately results in the top officers of the subsidiary reporting to the parent corporation does not establish the kind of day-to-day control necessary to establish an interrelation of operations." Pearson v. Component Tech. Corp., 247 F.3d 471, 501 (3d Cir. 2001); see also Frank v. U.S. West, Inc., 3 F.3d 1357, 1362 (10th Cir. 1993) (holding that fact that "supervisors ultimately reported to officers in the parent company [was] not enough to present a material factual dispute, because this exercise of control is not to a degree that exceeds the control normally exercised by a parent corporation"). Put plainly, the fact that two corporations share common officers is not evidence of an integrated enterprise, absent some

13

indication that the shared officers are involved in both corporations' operations or employment-related decisions. <u>See</u> <u>Hukill v. Auto Care, Inc.</u>, 192 F.3d 437, 443 (4th Cir. 1999). This is not a case in which related entities' personnel management is controlled by a single person or an oligarchy common to all the entities. <u>Cf.</u> <u>McKenzie v. Davenport-Harris</u> <u>Funeral Home</u>, 834 F.2d 930, 933-34 (11th Cir. 1987) (holding that businesses were integrated where common president controlled personnel management of both corporations).

Simply put, although Defendants admit that some management functions and services are shared, the issue remains "who had control of the day-to-day operations of the business and who had the authority to hire and fire employees." <u>Cruz-Lovo v. Ryder Sys., Inc.</u>, 298 F. Supp. 2d 1248, 1253 (S.D. Fla. 2003) (internal quotation omitted). Stated another way, the Court's primary inquiry is into "the degree of control an entity has over the adverse employment decision[s]" which gave rise to the suit. <u>Llampallas v. Mini-</u> <u>Circuits, Lab, Inc.</u>, 163 F.3d 1236, 1244-45 (11th Cir. 1998). Thus, Plaintiff's failure to present any evidence that any entity other than BSG participated in or controlled any decisions regarding her employment is fatal to her argument that Defendants are an integrated enterprise.[4]

---

[4]The Court explicitly rejects the argument that, because Defendants offer their employees the same profit-sharing plan, this demonstrates that they are an integrated enterprise. <u>See</u> <u>Frank</u>, 3 F.3d at 1363 (holding that parent's administration of a benefits plan for its subsidiaries is not proof of an integrated enterprise). Neither is Mr. Norris's isolated

14

In sum, the Court concludes that Plaintiff has not shown the existence of an issue of material fact regarding whether Defendants are an integrated enterprise. Accordingly, Plaintiff has also failed to generate an issue of fact regarding whether she was an eligible employee. Of course, Plaintiff counters that Defendant BSG has somehow "admitted" or conceded her eligibility. In Plaintiff's view, Defendant BSG has conceded her FMLA eligibility by: (1) stating to the Equal Employment Opportunity Commission that it employs more than 50 people, (2) treating employees at the Augusta store, including Plaintiff, as eligible employees in the past, and (3) failing to give Plaintiff notice under 29 C.F.R. § 825.110(d) that she was ineligible. None of these arguments is availing.

First, BSG's acknowledgment that it employs more than 50 employees *nationwide* is a far cry from conceding that it employs 50 people within a 75-mile radius of the Augusta store. Defendant BSG's "admission" was that it is an "employer" under the FMLA, not that Plaintiff was an eligible employee. See 29 U.S.C. § 2611(4). Of note, "there is no specific requirement to advise an employee that he or she is ineligible . . . because there are fewer than 50 employees

---

conversation with Mr. Biggerstaff proof of integration. See id at 1362-63 (explaining that fact that "one of parent's employees is an occasional consultant" for subsidiary is insufficient to show integration). Finally, Defendants' use of identical FMLA forms is also not indicative of integration. See Engelhardt v. S.P. Richards Co., Inc., 472 F.3d 1, 7 (1st Cir. 2006).

near his or her worksite." Freeman v. Sikorsky Aircraft Corp., CV 04-506, 2006 WL 2385311, at *4 (N.D. Okla. Aug. 17, 2006). Furthermore, the Court rejects Plaintiff's notion that Defendant BSG's past treatment of employees at the Augusta store is an admission that Plaintiff is an eligible employee. Plaintiff cites no law for this proposition, and the Court itself is aware of none. On the contrary, courts have allowed employers to raise an employee's ineligibility in spite of the employer's prior treatment of the employee.[5] See Mason v. United Food & Commercial Workers Int'l Unions, No. 04-C-7148, 2006 WL 644028, at *5-6 (N.D. Ill. Mar. 7, 2006). More generally, an employer's decision to exceed the requirements of the law will not obligate it to continue such solicitude indefinitely. See Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1528 (11th Cir. 1997) (case under the Americans with Disabilities Act). Finally, 29 C.F.R. § 825.110(d) "is invalid insofar as it purports to extend the eligibility provisions of the FMLA to an otherwise ineligible employee." Brungart v. Bellsouth Telecomm., Inc., 231 F.3d 791, 797 (11th Cir. 2000).

Because Plaintiff was not an eligible employee, her FMLA

---

[5]Of course, this is not to say that an employer can never become estopped from arguing that an employee is ineligible. See, e.g., Minard v. ITC Deltacom Communications, Inc., 447 F.3d 352, 359 (5th Cir. 2006); but see Pennant v. Convergys Corp., 368 F. Supp. 2d 1307, 1313 (S.D. Fla. 2005) (refusing to apply doctrine of equitable estoppel because "[t]here is no support from the Eleventh Circuit for applying the doctrine in FMLA cases"). Plaintiff has not outlined any argument that Defendant BSG should be equitably estopped from raising her ineligibility.

claims fail as a matter of law, irrespective of her characterization of her claims as alleging "interference" or "retaliation."[6] Therefore, Defendants are entitled to summary judgment on this ground alone. See <u>Hackworth v. Progressive Cas. Ins. Co.</u>, 468 F.3d 722 (10th Cir. 2006)(holding that, in order to survive summary judgment, plaintiff must produce evidence tending to show that the employer employed at least 50 employees within 75 surface miles of plaintiff's worksite). As explained below, there are additional and independent reasons necessitating summary judgment in this case.

## B. Plaintiff did not have a "serious health condition."

Plaintiff contends that her termination (1) interfered with her right to take FMLA leave, and (2) was in retaliation for her request for FMLA leave. The Eleventh Circuit has explained:

> The FMLA grants an eligible employee the right to take up to 12 workweeks of unpaid leave annually for any one or more of several reasons, including "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such position." 29 U.S.C. § 2612(a)(1)(D). The Act creates a private right of action to seek equitable relief and money damages against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights. 29 U.S.C. §§ 2615(a)(1), 2617(a); <u>see</u>

---

[6]<u>See</u> <u>Walker v. Elmore County Bd. of Educ.</u>, 379 F.3d 1249, 1253 (11th Cir. 2004) (holding that ineligible employee cannot bring a retaliation claim because "the statute does not protect an attempt to exercise a right that is not provided by the FMLA"); <u>Kosakow v. New Rochelle Radiology Assocs., P.C.</u>, 274 F.3d 706, 724 (2d Cir. 2001) (explaining that ineligible employee may not bring an interference claim because the FMLA "does not provide a private right of action for any employee, only for 'eligible employee[s]'"); <u>Morrison v. Amway Corp.</u>, 336 F. Supp. 2d 1193, 1196 (M.D. Fla. 2003) (explaining that only eligible employees may bring suit under the FMLA), <u>aff'd</u>, 383 F.3d 1253 (11th Cir. 2004).

17

Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 724-25, 123 S. Ct. 1972, 1976, 155 L. Ed.2d 953 (2003). We have recognized that § 2615(a) creates two types of claims: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." Strickland v. Water Works and Sewer Bd. of the City of Birmingham, 239 F.3d 1199, 1206 (11th Cir. 2001).

Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006). As should be apodictic, in order to bring either a retaliation or interference claim under the FMLA, Plaintiff must first demonstrate that she had a "serious health condition." Wilson v. NHB Indus., Inc., No. 06-11422, 2007 WL 136676, at *1 (11th Cir. Jan. 17, 2007) (citing Drago v. Jenne, 453 F.3d 1301, 1305-06 (11th Cir. 2006) & Cruz v. Publix Super Mkts., Inc., 428 F.3d 1379, 1382-83 (11th Cir. 2005)).

In her complaint, Plaintiff alleges that she needed a month-long leave of absence in order to adjust to new medications for her bipolar disorder, but that Defendants discouraged her from taking this leave and then fired her. Yet, none of her healthcare providers ever told her that changing her medications would require her to miss work. As a result, Defendants argue that Plaintiff cannot establish that she had a "serious health condition."

Under the pertinent regulations promulgated by the Department of Labor, a serious health condition is an

"illness, injury, impairment, or physical or mental condition that involves" (1) "inpatient care" or (2) "continuing treatment by a healthcare provider"[7] coupled with a period of

---

[7]A serious health condition involving continuing treatment by a healthcare provider includes:

(i) A period of incapacity (*i.e.*, inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

(ii) Any period of incapacity due to pregnancy, or for prenatal care.

(iii) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

(A) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

(B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

(iv) A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

(v) Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, *etc.*), severe arthritis (physical

incapacity. 29 C.F.R. § 825.114(a). Here, Plaintiff does not allege that she requested leave because she needed inpatient care. Rather, she claims that she needed a month-long leave of absence because she would be incapacitated while adjusting to new medications.

There is no evidence to support this claim. Between September 2002 and her termination in March 2003, none of Plaintiff's healthcare providers ever discussed, much less recommended, that Plaintiff would need to take medical leave as a result of any change in her prescribed medications. Nor is there any evidence that Plaintiff has ever actually experienced a period or episode of incapacity related to a change in medication. The FMLA only entitles an employee to a leave of absence when the employee's condition, treatment therefor, or recovery therefrom will render the employee "unable to perform the functions of [her] position." 29 U.S.C. § 2612(a)(1)(D). The absence of any evidence to support Plaintiff's claim that she requested leave because an adjustment in her medications would leave her unable to perform her job functions is fatal to Plaintiff's FMLA interference and retaliation claims.

That said, because Plaintiff's claims have been affirmatively contradicted by her own healthcare providers,

_____

therapy), kidney disease (dialysis).

29 C.F.R. § 825.144(a)(2).

Plaintiff now offers in her response brief that she was entitled to "intermittent" FMLA leave because her bipolar disorder had caused periods of incapacity in the past (most notably her hospitalization in 2001), and she needed time off in order to get treatment for this "chronic serious health condition." (See Pl.'s Br. in Resp. to Mot. for Summ. J. at 13, 16.) Although one might reasonably assume that intermittent leave may have been therapeutic, there is no evidence that Plaintiff ever notified her employer that she needed intermittent leave or a reduced leave schedule for her bipolar disorder. See 29 C.F.R. § 825.203 (defining intermittent leave). Nor is there any evidence that Defendants interfered with Plaintiff's healthcare or the course of treatment recommended by her doctors. Finally, there is no evidence from which to infer that intermittent leave was "medically necessary." See 29 U.S.C. § 2612(b)(1) (intermittent leave only appropriate when "medically necessary"); 29 C.F.R. § 825.203(c) (same).

Of note, none of Plaintiff's healthcare providers ever recommended intermittent leave or a reduced leave schedule until February 27, 2003, when Dr. Nelson-Abbott suggested that Plaintiff limit her work schedule to five days per week. Far from ever asking Defendants for a reduced leave schedule, Plaintiff actually rejected Dr. Nelson-Abbott's recommendation. That said, Plaintiff arguably requested intermittent leave on February 17, 2003, and February 28,

2003. On both occasions, Plaintiff requested two days off from work. On the first occasion, the leave request was granted. On the second occasion, Plaintiff only provided a note stating that she was "overextended." There was nothing in this letter to notify her employer that the requested absences might be FMLA-qualifying; neither is there any evidence that this requested leave was medically necessary. Simply put, Plaintiff's newly-raised claim that she was entitled to intermittent leave lacks any evidentiary support.

Furthermore, Plaintiff's attempt to recast her claims in her responsive brief is improper. See Hurlbert, 439 F.3d at 1297 (citing Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)). Plaintiff may not abandon her theory of the case (*i.e.*, that she was entitled to an extended leave of absence as she switched medications) in order to assert a fundamentally new claim (that she needed intermittent leave or a reduced work schedule, independent of any medication change) in her brief opposing summary judgment, filed after the close of discovery and the expiration of the deadline for filing motions. See Gilmour, 382 F.3d at 1315. In sum, Plaintiff's failure to show that her request for leave was required by a serious health condition is fatal to her claims.

## C.  **Plaintiff's retaliation claim fails.**

Next, assuming *arguendo* that Plaintiff was entitled to FMLA leave for a serious health condition, Defendants correctly argue that her retaliation claim would nevertheless

fail on the merits. "In order to state a claim of retaliation, an employee must allege that: (1) [she] engaged in a statutorily protected activity; (2) [she] suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." Strickland, 239 F.3d at 1207. "Once a plaintiff establishes a *prima facie* case of discrimination, the defendant-employer must articulate a legitimate, non-discriminatory reason for the challenged action." Wascura v. City of South Miami, 257 F.3d 1238, 1242 (11th Cir. 2001). Of particular interest here:

> If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. If the plaintiff fails to proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual, the defendant is entitled to summary judgment.

Id. at 1243 (internal quotations and citations omitted).

Initially, the Court notes that Plaintiff has presented scant proof of causation. Plaintiff was admittedly allowed to take medical leave in 2001 and again in February 2003, without any adverse consequences. Furthermore, Plaintiff contends that she began demanding FMLA in September 2002; she was not terminated until March 2003, several months later. Regardless, assuming *arguendo* that Plaintiff has come forward with a *prima facie* showing, Plaintiff has failed to create a

23

genuine issue as to whether Defendants' proffered reason for her termination is pretextual.

Defendants argue that Plaintiff was terminated because of an act of insubordination which violated work rules—namely, calling her supervisor a vulgar name. In order to survive Defendants' motion for summary judgment, Plaintiff must point to evidence that Defendants' proffered reason for her termination is plagued by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (Title VII case). Plaintiff argues that Defendants' reason for firing her was pretextual because: (1) she did not actually call Mr. Norris an "asshole"; (2) Mr. Krimmer and Mr. Olson did not investigate the incident; and (3) Mr. Krimmer and Mr. Norris were generally profane and verbally abusive and yet were not disciplined.

The first two arguments miss the mark. "An employer articulates a legitimate, non-discriminatory reason for termination where an employer had an honest, good faith belief for the termination, even if it turns out that the employer was mistaken in that belief." Holmes v. West Palm Beach Hous. Auth., 309 F.3d 752, 755 (11th Cir. 2002); see also Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452 (11th Cir. 1987). In other words, the issue is not the veracity of Mr. Norris's accusation, but whether Mr. Krimmer and Mr. Olson acted in

good faith.[8] Here, Plaintiff simply contends that Mr. Krimmer and Mr. Olson should have contacted her, obtained her version of the events, and believed her over her supervisor. This does not suffice to raise a genuine issue regarding whether Defendants' reason for terminating her was pretext for retaliation.

Plaintiff's attempt to smear her superiors also fails. In essence, Plaintiff contends that she was treated differently because of her request for FMLA leave. Of course, it is true that a plaintiff may present evidence of pretext by showing that other, similarly situated individuals were not disciplined for similar conduct. See, e.g., Damon v. Fleming Supermkts. of Florida, Inc., 196 F.3d 1354, 1363 (11th Cir. 1999) (ADEA case). However, Plaintiff has not shown that Mr. Norris, Mr. Krimmer, or anyone else at BSG committed conduct "nearly identical" to her own--the use of vulgar language to insult her manager. See Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). Although Plaintiff generally portrays Mr. Krimmer and Mr. Norris as profane, boorish men, she does not allege that they engaged in this type of conduct. Accordingly, Plaintiff has failed to point to evidence from which a reasonable juror could conclude that

---

[8]See Kariotis v. Navistar Intern. Transp. Corp., 131 F.3d 672, 677 (7th Cir. 1997); see also Sweeney v. Alabama Alcoholic Beverage Control Bd., 117 F. Supp. 2d 1266, 1273 (M.D. Ala. 2000) ("[W]hether or not a plaintiff actually committed the work rule violations is immaterial on the issue of pretext. Rather, what is material is whether or not the employer believed the allegations to be true, not whether they were in fact true.").

Defendants' proffered reason for her termination served as pretext for retaliation.

In sum, Plaintiff's FMLA claims fail for three, independent reasons: (1) she was not an eligible employee; (2) she has not shown that she had a serious medical condition necessitating the leave she requested; and (3) Plaintiff's retaliation claims fail as a matter of law.

### IV. CONCLUSION

For all of the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**. (Doc. no. 36.) The Clerk is **DIRECTED** to enter **FINAL JUDGEMENT** in favor of Defendants.

**ORDER ENTERED** at Augusta, Georgia, this ___23___ day of April, 2007.

HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE